# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 05-1003

RACINE CHARTER ONE, INC. D/B/A
21ST CENTURY PREPARATORY SCHOOL,
CHRISTINE HAUCK, AND SHERRY JAMES,

*Plaintiffs-Appellants,*

v.

RACINE UNIFIED SCHOOL DISTRICT,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03-C-484—**J.P. Stadtmueller**, *Judge.*

_____

ARGUED JUNE 8, 2005—DECIDED SEPTEMBER 22, 2005

_____


Before CUDAHY, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Plaintiff Racine Charter One (Charter One), an independent public charter school located in Racine County, Wisconsin, sued defendant Racine Unified School District (RUSD), alleging that the district's refusal to bus the charter school's students constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment to the United Stated Constitution and 42 U.S.C. § 1983. The district court granted summary judgment in RUSD's favor, finding that Charter One students are not similarly situated to those students who do receive

the busing benefit, and that the additional cost of transport-ing Charter One students constituted a rational basis for RUSD's decision to deny the school's request for transporta-tion. Because we find that the plaintiff's students are not similarly situated to those who receive the busing benefit, and that the additional cost of extending the busing benefit to Charter One students provides a rational basis for RUSD's decision not to transport the plaintiff's students, we affirm.

## I.  BACKGROUND

Wisconsin law provides for two kinds of charter schools: those sponsored by local school districts, Wis. Stat. § 118.40, and those sponsored by other entities explicitly authorized by the state legislature, Wis. Stat. § 118.40(2r) (hereinafter, "(2r) charter schools"). Charter One falls within the latter category, established by the University of Wisconsin-Parkside pursuant to authority granted on a pilot basis by Wisconsin Statute § 118.40(2r)(b)(1)(c). The plaintiff school is located in Racine County, Wisconsin, and falls within the geographical boundaries of the RUSD.

The charter school, which is open and free to all who seek to enroll, is the only (2r) charter school located within the RUSD. The school operates independently from the defen-dant, as the district does not govern or exert any control whatsoever over the (2r) charter school. Charter One currently teaches grades K-6, and enrolls approximately 305 students. Its school year is longer than the ordinary RUSD public school year, and even includes a mandatory three-week summer session. Its students reside throughout Racine County.

In addition to providing for the establishment of charter schools, Wisconsin law also obliges local school districts to provide transportation to certain students residing within their districts. Wisconsin Statute § 121.54 requires each

local school district to transport public, private, and parochial school students who (1) reside within the district; (2) attend a school within the geographical boundaries of that district; (3) attend a school within their designated attendance area; and (4) (a) reside two miles or more from that school or (b) would otherwise encounter unusual hazards in walking to and from that school. Wis. Stat. §§ 121.54(2)(a), 121.54(2)(b), & 121.54(9). RUSD's written transportation policy closely tracks the requirements of Section 121.54, with one exception. In contrast to the state-required minimum radius of two miles, the RUSD policy provides transportation for all otherwise qualifying K-5 students who live only *one and one-half miles* or more from their respective schools.[1] Thus, at least in this one respect, RUSD has extended the busing benefit to more students than Wisconsin state law would require.

Before opening in September 2002, Charter One requested that RUSD bus its students. In response to this request, RUSD sought legal advice from various sources—including its own counsel and Chief Legal Counsel to the Wisconsin Department of Public Instruction (DPI)—as to whether the district was legally obliged to provide transportation to Charter One. All agreed that Wisconsin Statute § 121.54 did not require public school

---

[1]  Section 3541.3(c)(1) of the RUSD Transportation Policy, entitled "Transportation Service," provides:

> All public and non-public school students, grades K-5, living one and one half or more miles from their respective schools or being eligible for transportation under Wisconsin Statute 121.54(9)—hazardous conditions—shall be transported. All public and non-public school students, grades 6-12, living two or more miles from their respective schools or being eligible for transportation under Wisconsin Statute 121.54(9)—hazardous conditions—shall be transported.

districts to transport students of independent charter schools established pursuant to Wisconsin Statute § 118.40(2r). The DPI further concluded that such an interpretation of the statute did not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Based on this understanding of Wisconsin law, the RUSD school board, by a vote of 5-4, denied Charter One's request for transportation service in February 2003.

In May 2003, Charter One brought this action against RUSD, asserting that its refusal to bus Charter One students violated the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. The district court granted RUSD's motion for summary judgment, finding that Charter One students were not "similarly situated" to those students who did receive the RUSD busing benefit, and that RUSD had a rational basis for its decision not to bus Charter One students—namely, avoiding the "unique and additional costs" that such busing would present. Charter One appeals.

## II.  ANALYSIS

We review a grant of summary judgment *de novo*, construing all facts in favor of the non-moving party. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 974 (7th Cir. 2004).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that he or she was (1) deprived of a federal right, privilege, or immunity (2) by any person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 638 (1980) (citing 42 U.S.C. § 1983). The federal right in question here is derived from the the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause provides that "no State shall . . . deny to any persons within its jurisdiction the equal protection of laws." U.S. CONST.

amend. XIV, § 1. In so providing, "the Equal Protection Clause gives rise to a cause of action on behalf of a 'class of one' where the plaintiff did not allege membership in a class or group." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). "[S]uccessful equal protection claims brought by a 'class of one'" have been recognized "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564.

Here, the district court properly construed Charter One's complaint as alleging a class of one equal protection claim. *See Olech*, 528 U.S. at 564 n.* ("Whether the complaint alleges a class of one or of [more] is of no consequence because we conclude that the number of individuals in a class is immaterial for equal protection analysis."). Charter One argues that local government officials within the RUSD denied the school and its students the benefit of busing otherwise provided to all others similarly situated without a rational basis for distinction. Accordingly, we review the merits of Charter One's claim under the *Olech* standard, examining first whether the plaintiff's students are indeed similarly situated to those students within the RUSD who do receive busing.

## A.   Charter One Students Are Not Similarly Situated

To be considered "similarly situated," comparators must be "*prima facie* identical in all relevant respects," *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455-56 (7th Cir. 2004), or "directly comparable to [plaintiff] in all material respects," *Ajayi v. Aramark Bus Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003). Indeed, "[i]t is clear that similarly situated individuals must be very similar indeed." *McDonald*, 371 F.3d at 1002. Here, the pertinent comparison must be made between those students within the RUSD who

receive busing, and those Charter One students who do not. More accurately, the comparison pits RUSD public and private school students who reside within the RUSD, who live one and one-half miles or more from their school or encounter hazardous conditions along the school route, and who do receive busing, against Charter One students who reside within the RUSD, who live one and one-half miles or more from their school or encounter hazardous conditions along the school route, and who do *not* receive busing.

But there is some controversy as to whether the comparison should end there. Charter One thinks so, contending that we should look only to—and see patent similarities in—both class' residence and attendance within the district, and their distance from school or their proximity to hazardous conditions along the way. Indeed, if this were all to our comparison, the students of both classes would clearly be similarly situated, as the James family illustrates. Two of the James children attend Charter One, and one attends an RUSD public school. All live in the same house and face the same hazardous condition in getting to school (there is no sidewalk on their road). But while the RUSD student gets free busing, the Charter One students do not.

RUSD, on the other hand, insists that our analysis cannot end with the students themselves, but rather must also account for the differences in the schools that the students of each class attend. Indeed, a student's situation is, at least in part, a product of the school that he or she attends. Various factual traits, circumstantial nuances, and peculiarities can set entities apart, rendering them, by virtue of their differences, amenable to disparate treatment. *See, e.g.*, *Bell v. Duperrault*, 367 F.3d 703, 708-09 (7th Cir. 2004) (finding equal protection class of one plaintiff not similarly situated where the purportedly comparable individuals submitted applications for pier extensions at different times than the plaintiff, requested different kinds of extensions,

or requested mere renovations as opposed to wholly new structures); *Purze*, 286 F.3d at 455 (finding equal protection class of one plaintiffs not similarly situated where "the allegedly similarly-situated individuals . . . requested different variances than the [plaintiffs] requested; submitted their plats [for a subdivision] during different time periods; and had their plat requests granted by different and previous Boards"); *cf. Ciechon v. City of Chicago*, 686 F.2d 511, 522 (7th Cir. 1982) (finding two paramedics similarly situated where both "experienced the same set of circumstances and were equally responsible for patient assessment and treatment" on ambulance runs, yet one "was charged with failure to perform her duties and discharged" while the other "was never charged or disciplined in any fashion"). Toward that end, the defendant directs our attention to the unique character of Charter One.

We begin by noting that the Wisconsin laws defining public schools and public school districts were passed well before the legal conception of charter schools. For that reason, much of the operative law on which our analysis must focus fails to account for these charter schools, or, more importantly, the Unified School Districts' obligations with respect to them. Thus, as we broach this uncertain area of Wisconsin law, we must make clear that our opinion extends only to the narrow issue before us: whether RUSD's decision not to bus (2r) charter school students violates equal protection.

Wisconsin Statute § 121.54(2) requires school districts like RUSD to transport "public" school students. That Charter One is a public school, no one contests. But while Charter One contends that its public status entitles it to Section 121.54 busing at RUSD's expense, RUSD insists that the statute's reach does not extend so far. While it is true that Section 121.54 does require RUSD to transport public school students, it does not mandate the transportation of *all* such students. Rather, it obliges the district to

transport only those public school students who reside within its geographical boundaries. Certainly, no party would argue that Section 121.54 requires the RUSD to bus the residents of other school districts to public schools located in other districts. Wis. Stat. § 121.54(10) ("[A] school board may not provide transportation under this subsection for a nonresident pupil to or from a location within the boundaries of the school district in which the pupil resides."). Nor, with irrelevant exceptions, would the district be required to bus the residents of other school districts who attend RUSD public schools. Furthermore, and again with exceptions not pertinent here, the RUSD would not be required to bus its own residents to schools located in other school districts.

With these limitations in mind, RUSD contends that Charter One is the functional equivalent of an independent school district, and as such responsible for its own busing. By RUSD's measure, while Charter One is a public school, its students would be no more entitled to RUSD-funded busing than students attending adjacent school districts such as Kenosha Unified School District, Oak Creek School District, or Raymond School District. While Charter One would at first blush appear to fall within the geographical boundaries of the RUSD, it is, according to the defendant, in fact its own administrative island—an independent school district surrounded on all sides, though not subsumed, by the RUSD.

Charter One is a unique statutory creation. Unlike other public schools within the RUSD (or private and parochial schools for that matter), Charter One came to being through a charter granted by the University of Wisconsin-Parkside. The University was specifically vested with the authority to do so by the Wisconsin state legislature pursuant to Wisconsin Statute § 118.40(2r)(b). Charter One has its own board, its own faculty, and its own staff. As an administrative matter, the school operates wholly independent of

RUSD. RUSD governs neither the charter school nor its board. Indeed, the district may not exert any control whatsoever over Charter One, and Charter One cannot exert any control over the district. The two entities simply enjoy no legal relationship.

This autonomy in administration goes a long way to suggest that Charter One is not just an independent public school, but also an independent public school district. Wisconsin law defines "school district" as "the territorial unit for school administration." Wis. Stat. § 115.01(3). And while this provision does not explicitly include the word "charter," it does not exclude the term from its definition either. To the contrary, Charter One's independence and sole responsibility for its own administration would suggest that the otherwise unmentioned entity falls squarely within Section 115.01(3)'s definition.

Charter One's administrative autonomy—particularly with reference to busing obligations—is further demonstrated by its own charter. Section 4.8 of the Charter School Contract Between the Board of Regents of the University of Wisconsin System and Charter One, entitled "Transportation Contracts," vests Charter One with the authority to "enter into contracts *with other school districts* or persons, including municipal and county governments, for the transportation of Charter School students *to and from school* and for field trips." (emphasis added). This language, along with signaling the charter school's administrative autonomy, also suggests that contracting for—as opposed to stark entitlement to—busing from school districts was contemplated from the outset. Charter One, however, insists that its ability to contract for transportation services does not set it apart from other schools within the RUSD. First, it notes that RUSD itself possesses such authority. But such a comparison is self-defeating, as Charter One's effort here to liken itself to an independent school district

only reinforces the view that the school is an autonomous district as well.

The charter school's second argument, which suggests that its authority to contract for transportation free from RUSD interference is no different than that of private schools whose students nonetheless receive the busing benefit, is more compelling, yet ultimately unavailing as well. As a threshold matter, Charter One has adduced no evidence to support its claim regarding the contracting authority of private schools. But even were we to assume the veracity of such an unsupported claim—an eminently reasonable assumption—the proffered comparison does nothing to advance the school's "similarly situated" argument. Charter One concedes—indeed insists—that it is a public school. Under no construction would it or any other party argue that it was a private school. Thus, its charter-prescribed ability to contract for transportation, while akin to the powers of those private schools which receive the RUSD busing benefit, does nothing to liken this unique public school to RUSD public schools that receive busing. It is upon this comparison that Charter One's similarly situated argument depends. While there may be some arguable uncertainty over exactly what kind of public school a (2r) charter school is, one thing is clear: they most certainly are not private or parochial schools.

In addition, we think it worthy to note, though not dispositive to our analysis of the current state of Wisconsin law, that the Wisconsin legislature has twice attempted—and failed pursuant to gubernatorial veto—to pass legislation that would provide charter schools like Charter One the busing to which the plaintiff here claims a present entitlement. A.B. 261, Assem., 2003 Reg. Sess. (Wis. 2003); S.B. 44, Senate, 2003 Reg. Sess. (Wis. 2003). These attempts suggest that even the body entrusted with providing the busing benefit does not believe that it has yet been conferred to charter schools.

Accordingly, we affirm the district court's finding that Charter One has failed to show that its students are similarly situated to those students who do receive the busing benefit.

## B. RUSD Has A Rational Basis for its Decision to Deny the Busing Benefit

But even assuming that Charter One's students are similarly situated to other students within the RUSD, the school's challenge fails nonetheless in light of the plaintiffs' failure to meet the class of one claim's second prong.

The exact contours of the second prong of the class of one equal protection claim are not quite clear. As we noted above, the Supreme Court in *Olech* held that it has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated *and that there is no rational basis for the difference in treatment.*" 528 U.S. at 564 (emphasis added). However, since *Olech* was decided, the standard for such class of one claims has been muddled in this circuit by two divergent lines of cases. *Tuffendsam v. Dearborn County Bd. of Health*, 385 F.3d 1124, 1127 (7th Cir. 2004) (recognizing divergent lines); *Indiana Land Co. v. City of Greenwood*, 378 F.3d 705, 713 (7th Cir. 2001) (same). In one line of cases, panels of this court have held that a class of one equal protection claim is established where the defendant has intentionally treated the plaintiff differently than others similarly situated either without any rational basis for doing so or out of some "totally illegitimate animus." *See Lunini v. Grayeb*, 395 F.3d 761, 768 (7th Cir. 2005); *Levenstein v. Salafsky*, 414 F.3d 767, 775-76 (7th Cir. 2005); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (citing, *inter alia*, *Olech*, 528 U.S. at 564); *Nevel v. Vill. of Schaumberg*, 297 F.3d 673, 681 (7th Cir. 2002);

*Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). In another line, however, we have held that the mere absence of a rational basis is not enough to sustain the class of one claim, and that instead the plaintiff must prove illegitimate animus in order to succeed. *See Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000); *see also Crowley v. McKinney*, 400 F.3d 965, 972 (7th Cir. 2005); *Purze v. Vill. of Winthrop Harbor,* 286 F.3d 452, 455 (7th Cir. 2002); *Cruz v. Town of Cicero,* 275 F.3d 579, 587 (7th Cir. 2001); *Bartell v. Aurora Public Schools,* 263 F.3d 1143, 1149 (10th Cir. 2001); *Bell v. Duperrault,* 367 F.3d 703, 709-13 (7th Cir. 2004) (Posner, J., concurring).

Cases like "*Nevel* and *Albiero* track explicitly the Supreme Court's holding and are wholly consistent with its rationale." *Indiana Land Co.*, 378 F.3d at 713 (Ripple, J., concurring). In contrast, the Supreme Court explicitly declined to reach the animus approach upon which *Hilton* and its progeny insist, concluding that "allegations [of intentional action with no rational basis], *quite apart from the Village's subjective motivation*, are sufficient to state a claim for relief under traditional equal protection analysis. We therefore affirm the judgment of the Court of Appeals, *but do not reach the alternative theory of 'subjective ill will'* relied on by that court." *Olech*, 528 U.S. at 565; *see also Bell*, 367 F.3d at 711 (Posner, J., concurring) (conceding that insisting on a free-standing animus test for class of one claims may be akin to "fighting a doomed rearguard action").

Indeed, it appears our court may have created a "tension" with *Olech* and established national law where previously none existed. *Indiana Land Co.*, 378 F.3d at 714 (Ripple, J., concurring). True, sound reasons have been advanced for grafting the animus requirement onto the class of one claim—without such a requirement, "breathtaking vistas of liability" might be opened, *Tuffendsam*, 385 F.3d at 1127, and ordinary state law disputes might become the subject

of constitutional challenge, *Bell*, 367 F.3d at 712 (Posner, J., concurring). That said, the appearance of the animus requirement on the class of one stage is no less jarring. However, we need not decide under which standard the class of one plaintiff must proceed, as here Charter One fails under both. Because the plaintiff has failed to allege, let alone show, any subjective ill will on the part of the RUSD in denying the busing benefit, Charter One's class of one claim would clearly fail under the animus standard.[2]

Under the rational basis test, the court "will uphold the legislative enactment (or classification) so long as it bears a rational relation to some legitimate end." *Eby-Brown Co., LLC v. Wis. Dep't of Agric., Trade & Comsumer Prot.*, 295

---

[2] At oral argument, Charter One did as an afterthought float in rebuttal the idea that RUSD's decision not to bus its students might have been the product of improper animus—the animus being, according to Charter One, a form of jealousy harbored by the financially-strapped RUSD (which has struggled of late to win money from the public through referenda that would enable it to pay its bills and maintain its athletic programs, *see* Alice L. Chang, *Passage of Referendum Gives District a Breather: Unified gets $6.45 Million For Next Year*, MILWAUKEE J. & SENTINEL, June 25, 2005, at A1; Alice L. Chang, *District Wrestles with Money Troubles: Racine Faces Job Cuts, Closing of Schools*, MILWAUKEE J. & SENTINEL, Apr. 26, 2005, at A5; Alice L. Chang, *Budget Cuts Loom in Racine Unified School District: Staff, Athletics May Be Targeted After Defeat of Referendum*, MILWAUKEE J. & SENTINEL, Apr. 10, 2005, at A1) against the more-affluent Charter One (which counts among its various financial backers the S.C. Johnson Fund). This argument—whatever its merit—was not presented to the district court, and has accordingly been forfeited. *See, e.g.*, *United States v. Olano*, 507 U.S. 725, 731-32 (1993) ("No procedural principle is more familiar to this Court than that . . . a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.") (internal quotes omitted).

F.3d 749, 754 (7th Cir. 2002). A court will not strike down a state policy merely because it "may be unwise, improvident, or out of harmony with a particular school of thought." *Id.* Rather, this inquiry requires the court to "consider only whether any state of facts reasonably may be conceived to justify the classification," *Rabbi Abraham Grossbaum and Lubavitch of Indiana, Inc.v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1292 (7th Cir. 1996), and it is enough that "a purpose may conceivably or may reasonably have been the purpose and policy of the relevant governmental decisionmaker," even if the decisionmaker never articulated that rationale, *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992). Here, the unique and independent nature of Charter One not only suggests that the school's students are not similarly situated to those who do receive RUSD busing, but also provides a rational basis for denying the benefit to those students.

Again, the unique and autonomous nature of Charter One—a seeming functional equivalent of an independent school district—provides one such rational basis for RUSD's decision not to bus the charter school's students. According to RUSD, its goal is to provide busing only to those students whom it is required to transport by law—namely, students of its own schools and resident students of private and parochial schools located within the district. Were we to view Charter One as its own school district, RUSD would be no more required to transport the charter school's students than it would be required to transport resident students who attend adjacent school districts. Indeed, as Charter One concedes, RUSD's policy is consistent with that of school districts throughout Wisconsin, which uniformly exclude independent charter schools from their busing schemes. And the mere fact that Charter One is the only independent charter school within the geographic boundaries of the RUSD does not render its exclusion discriminatory. Based on the administrative autonomy afforded (2r)

charter schools under Wisconsin law, it seems that they do exist beyond the pale of local school district transport obligations—an independence that would serve as a rational basis to deny such schools Section 121.54 busing.

But we need not find that Wisconsin charter schools established under Wisconsin Statute § 118.40(2r) in general, or Charter One in particular, constitute independent schools districts of their own right in order to reveal the deficiency in the plaintiff's class of one equal protection claim here. Rather, we need only recognize the unique and additional costs that RUSD would incur were it to provide such service to Charter One.

As RUSD expressed at oral argument, "Cost is the issue; cost is everything here." This Court has already recognized cost as a rational basis for differential treatment. *Irizarry v. Board of Educ. of City of Chicago*, 251 F.3d 604, 610 (7th Cir. 2001); *see also Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 83-84. The record does not provide a hard number on exactly how much more it would cost RUSD to bus Charter One students. It does afford an estimate of how much it would cost to implement from scratch an independent busing scheme devoted solely to Charter One students—$124,000 per year for 257 students—a quote Charter One obtained from a bus company as a result of its own research into potential transportation costs. But this figure is in all likelihood over-inflated. For one, the estimate assumed that nearly the entire Charter One student body at the time would require busing—an unlikely assumption (though we do note that the size of the student body has since expanded to over 300, and is designed to reach at least 400 in the future). Furthermore, the extension of the RUSD busing benefit to Charter One students would not require the wholesale implementation of new busing schedules and routes, but rather could be accomplished, at least in part, by taking advantage of the busing scheme already in place.

Indeed, Charter One makes much of the fact that there are already existing RUSD bus routes that pass by Charter One with empty seats—seats that the school contends could be filled by its students. But just because a bus has empty seats when it passes by Charter One does not necessarily mean that those seats are going unused. Rather, those seats may be reserved for students yet to be picked up, or perhaps only recently vacated by students dropped off mere moments before passing the school. Thus, there may not be as much room on those buses as the plaintiff suspects, and the less room there is, the more the need for additional buses to accommodate Charter One students—at a daily rate of $124.66 per bus, not including an additional $24.29 per run. Dep. of Karen Flynn at 84-85 (July 18, 2003).

Regardless of the current load and capacity of the existing buses and their designated routes, other peculiarities associated with adding Charter One students to the RUSD busing mix might work appreciable costs in both RUSD time and money. To avoid the cost of implementing a busing scheme devoted exclusively to Charter One, RUSD would almost certainly be forced to alter its current busing routes. Some buses service more than one school, requiring the accommodation of not only the various, specific addresses of each passenger (both current riders and each added Charter One student), but also the coordination of potentially different start and end times at each school serviced. Such alterations would come with appreciable costs, be they the creation of new routes, the addition of more busses, or the elongation of bus routes requiring earlier pick-ups and later drop-offs. And while the record does not allow us to quantify these additional costs to RUSD with any degree of certainty, we are confident that they are substantial enough to provide a rational basis for RUSD's refusal to extend the busing benefit to Charter One students.

It requires no stretch of the imagination whatsoever to see that cost is indeed RUSD's issue here. Compared to

Charter One's relatively small and manageable universe of students, faculty, and staff, RUSD must care for the needs and costs of over 20,000 students, as well as dealing with the monetary demands of various collective bargaining groups and legislative caps on its spending. True enough, both Charter One and the schools of the RUSD receive the same amount of operational funding from the DPI (about $6900 per pupil per year); but only the plaintiff can draw on generous financing from local benefactors such as the S.C. Johnson Fund in times of need. And if the money runs out, Charter One can go to that generous benefactor for assistance; school districts, such as RUSD, on the other hand, are forced to prostrate themselves before the taxpayer, at the mercy of referenda. RUSD tells us that it simply cannot take on any more costs without receiving more money. The defendant admitted at oral argument that if cost was not an issue—if it could be paid or reimbursed the costs of busing Charter One students by Charter One itself or one of its financial backers—then the district would have no objection to extending the benefit. Such contracting for services is precisely what these circumstances call for, as we again note Section 4.8 of the plaintiff's charter, which explicitly empowers the school to enter into such contracts for transportation.

But the defendant's financial straits need not be dire for us to find its refusal to extend transportation services to Charter One rational. We need only recognize that extending the busing benefit will come at a significant enough expense to RUSD, and that is rational basis enough to justify its transportation policy decision. For now, it suffices to say that Charter One is not entitled to a free ride.

## III.  CONCLUSION

For the reasons stated above, we AFFIRM the district court's grant of summary judgment in the defendant's favor.

CUDAHY, *Circuit Judge*, concurring in part and concurring in the judgment.  While I concur in the affirmance of the district court, I would follow a different course of reasoning. Specifically, although I agree that Charter One, as a unique statutory creation with distinct sources of funding, is not similarly situated to other *schools* located in the RUSD (and thus may be subject to disparate treatment), I believe that the children of the two individual plaintiffs, who are Charter One students, *are* similarly situated to at least some of the *students* furnished busing by the RUSD. Accordingly, RUSD's refusal to bus Charter One students based solely on their school affiliation seems irrational.

RUSD buses all public and private school students who live more than 1.5 miles from their chosen school or who face hazardous walks to school—even those it is not statutorily required to transport—ostensibly for safety reasons. And it denies transportation services to otherwise qualified Charter One students allegedly for cost reasons. Both safety and cost would seem to be eminently legitimate state interests. The question then becomes whether RUSD's busing policy is rationally related to these interests—i.e., whether RUSD's refusal to bus Charter One students (and *only* Charter One students) is rational in light of those interests.

Purely as a matter of logic, the RUSD policy does not hold up. Of course, as a general matter it is rational to base government policies on considerations of cost. *Irizarry v. Bd. of Educ. of the City of Chicago*, 251 F.3d 604, 610 (7th Cir. 2001). And despite the plaintiffs' allegations that many of the Charter One students could be accommodated with existing buses and existing bus routes, there will always be some additional cost associated with transporting new students, even if it is just the added time, fuel and mileage associated with making additional stops on existing bus routes. Yet even assuming that the Charter One students will bring higher costs, there appears to be no rational basis

for excluding *these particular* students versus the other students RUSD has chosen to transport. Put differently, since there is no indication in the record that Charter One students are somehow inherently more costly to transport per mile than other students that RUSD has chosen to bus, a per se policy excluding them on cost grounds is not rational.

RUSD (and the district court) point out that Charter One students have a longer school year than students at other public schools and a mandatory summer session, both of which, it is claimed, will make Charter One students uniquely costly to transport on an annual basis. Yet it is undisputed that RUSD already buses students of at least one year-round elementary school (James Elementary School) and provides busing for RUSD summer school students. (App. D. at 44.) Thus cost considerations related to the length of the Charter One school year do not explain why RUSD refuses to bus Charter One students but is willing to transport these other year-round students.

The RUSD policy is also irrational with respect to safety considerations. It is undisputed that RUSD already buses children who live in the same neighborhoods and walk similar distances along the same routes to school as Charter One students. The children of plaintiff James provide a case-in-point. All three of the James children must cross the same "hazardous" areas on their way to school,[1] yet RUSD buses only the one child who attends Julian Thomas Elementary School, refusing to bus the two siblings who attend Charter One, solely because of their school affiliation. Purely as a matter of safety, there is no rational reason to deny two of these children transportation while busing their sibling.

---

[1]  Specifically, the children must cross Washington Avenue, which has been deemed "hazardous" by the relevant district authorities.

The other criterion of eligibility for the RUSD policy is the distance a student must travel to attend school. And here again there is no rational basis—based on either cost *or* safety—for distinguishing between Charter One students who live 1.5 miles or more away from their chosen school and other children who must travel the same distances. In short, given RUSD's own stated policy goals, there is no rational basis for distinguishing between Charter One students who face hazardous walks to school or live 1.5 miles or farther from Charter One and the other students whom RUSD is not statutorily required to transport[2] but who receive busing services based on these same criteria.

Once RUSD has extended its transportation policy to include students that it is not legally required to transport, and has established objective criteria—based solely on distance and safety—to determine which students are eligible for transportation, RUSD cannot rationally exclude certain students based on school affiliation alone. Excluding Charter One students might save money; it might be good administrative practice; but the key consideration here is rationality, and such a policy is not rational in light of the other students RUSD already transports. It is not rational to treat equally expensive or equally at-risk students differently based solely on their school affiliation. Indeed if RUSD's cost-based arguments here can succeed, any government official could deny service to any individual, regardless of the dictates of government policy, based solely on the proposition that serving one additional person would cost more than not serving him or her.

_____

[2] In fact the plaintiffs argue that RUSD might be statutorily required, under Wisconsin law, to transport Charter One students. However, this state law claim is not before this Court on appeal.

Yet the claims of the student plaintiffs still must fail for one simple reason: they have not alleged or introduced evidence suggesting that RUSD acted out of hostility or illegitimate animus toward them.

Contrary to the majority's framing of the class of one inquiry, we have held quite recently that " 'to make out a *prima facie* case [of a 'class of one' denial of equal protection] the plaintiff must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws *for reasons of a personal nature unrelated to the duties of the defendant's position.*' " *Tuffendsam v. Dearborn County Bd. of Health*, 385 F.3d 1124, 1127 (7th Cir. 2004) (quoting *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000)) (emphasis added). That is, the plaintiffs must demonstrate that the defendant's actions were not merely arbitrary and irrational, but motivated by "animosity" or "personal hostility"—a desire to make the plaintiff worse off than others similarly situated. *Crowley v. McKinney*, 400 F.3d 965, 972 (7th Cir. 2005). *Accord Hilton*, 209 F.3d at 1008 (requiring class of one plaintiff to demonstrate that defendant acted out of "illegitimate animus") (internal quotation marks omitted).[3]

---

[3] Admittedly, the precise contours of the class of one theory have not always been drawn with total clarity. Here the majority acknowledges the existence of two lines of cases in this circuit—one of which recognizes animus as a requisite to a class of one discrimination claim while the other apparently recognizes only irrationality. *See Tuffendsam*, 385 F.3d at 1127 (noting this ambiguity); *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001-02 (7th Cir. 2004) (same); *Bell v. Duperrault*, 367 F.3d 703, 709-10 (7th Cir. 2004) (Posner, J., concurring) (discussing the ambiguity and collecting cases). The majority then suggests (I think incorrectly) that the animus line of cases might be withering on the vine.

(continued...)

This animus requirement was introduced out of concern that, in its broader formulations, the class of one theory opens up "breathtaking vistas of liability," *Tuffendsam,* 385 F.3d at 1127, and threatens to transform ordinary state law disputes—or even previously unreviewable acts of police discretion—into fodder for constitutional lawsuits. *See Bell v. Duperrault,* 367 F.3d 703, 712 (7th Cir. 2004) (Posner, J., concurring) (noting that since "irrational differences in treatment having nothing to do with discrimination against a vulnerable class abound at the bottom rung of law enforcement . . . . the federal courts will be swamped with 'class of one' cases remote from the purpose, and beyond the feasible scope, of the equal protection clause"); *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 566 (2000) (Breyer, J.,

---

3  (...continued)

Yet at least two of the cases upholding an animus require-ment actually post-date authorities relied upon by the majority, comprising some of this Court's most recent pronouncements on the issue. Additionally, while the Supreme Court's cursory treatment of the class of one theory in *Village of Willowbrook v. Olech,* 528 U.S. 562, 564-65 (2000), does not reach this animus requirement, the Court also does not disavow it, and over the last year we have concluded that some level of animus is implied in the requirement that any adverse treatment be "intentional": "[W]e don't think the Supreme Court in *Olech* intended to overrule *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), which holds that an official 'intends' a consequence when he acts because rather than in spite of it." *Tuffendsam,* 385 F.3d at 1127.

More fundamentally, as long as the cases recognizing the animus requirement have not been overruled or otherwise authoritatively rejected, I think it preferable in cases like this to rely on a lack of animus rather than, with all respect, to have recourse to rather tortured analyses of irrationality. The present case is an excellent example of the need for a sensible limiting principle less elusive than the sometimes will-of-the-wisp of irrationality.

concurring) (registering "concern about transforming run-of-the-mill zoning cases into cases of constitutional right"); *Hilton,* 209 F.3d at 1008 (rejecting the "no rational basis" approach because "[i]f a merely unexplained difference in police treatment of similar complaints made by different people established a *prima facie* case of denial of equal protection of the laws, the federal courts would be drawn deep into the local enforcement of petty state and local laws").

Indeed in the case before us one can certainly glimpse the enormous new areas of potential liability opened up by the "class of one" theory, as well as the corresponding need for a limiting animus requirement. If elementary school students may resort to a federal constitutional lawsuit to challenge any irrational misallocation of school district resources—even ones that implicate no fundamental right[4] and involve no suspect classification[5]—what else might be covered by the Equal Protection Clause? Absent some restriction on the doctrine, Judge Posner's nightmare scenario, outlined in *Bell v. Duperrault*, 367 F.3d at 709-10, of citizens bringing constitutional challenges against the uneven issuance of speeding tickets may not be hyperbole after all. Certainly RUSD's policy here, as applied to the

---

[4] It is well established that the right to an education is not considered a fundamental right, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33-35 (1973); *Martin v. Shawano-Gresham School Dist.*, 295 F.3d 701, 712-13 (7th Cir. 2002), and students have no right whatsoever to free transportation to school, *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 458-61 (1988); *Johnson v. Daley*, 339 F.3d 582, 586 (7th Cir. 2003) (en banc) ("A right to education does not imply a right to free transportation to school.") (citing *Kadrmas*).

[5] There is no allegation that RUSD refuses to transport Charter One students based on their race, nationality, gender, age or other (quasi) suspect classification.

individual plaintiffs, is no more arbitrary or irrational than the decision of a traffic cop to ticket one particular speeding car while refusing to ticket other cars traveling at similar speeds.

Without any allegation or showing of animus against the plaintiff school children, the individual plaintiffs simply have not made out a *prima facie* case of discrimination under the class of one theory as articulated by this Court.

Before closing, I should also add that the current lawsuit appears not just legally misguided but also wholly unnecessary. For aught that appears, this dispute could have been settled simply by arranging for payments from Charter One to RUSD to cover the additional cost of busing Charter One students. Indeed this sort of thing seems to be standard practice in every other school district in the state. It is undisputed that virtually all of Wisconsin's 120 other charter schools pay for their own students' busing to some degree, and, as the majority notes, section 4.8 of Charter One's own founding charter seems to anticipate a similar arrangement. In the end the key issue, as both parties apparently concede, is not whether the Charter One students will ultimately receive busing, but who must pay for it. Regardless of who is most at fault for the current impasse, this is just not the stuff of constitutional litigation.

A true Copy:

      Teste:

                                _____

                                *Clerk of the United States Court of Appeals for the Seventh Circuit*